## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

-------------------------------------------------x

Bonnie Hernandez,

                  Plaintiff,                       **AMENDED COMPLAINT**

        v.                          Case No. 4:23-cv-319 (MW) (MAF)

United States of America,

                  Defendant.

-------------------------------------------------x

Plaintiff, Bonnie Hernandez, by and through her attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Untiedt Dabdoub & Tyler, PLLC for her Complaint against Defendant as above captioned, brings claims and alleges as follows upon information and belief:

## **INTRODUCTION**

1.    Lenton Jerome Hatten (hereinafter "Officer Hatten") was a former sports specialist or correctional officer at Federal Correctional Institute, Tallahassee (hereinafter "FCI Tallahassee") who used his position and authority to stalk, sexually abuse, harass, assault, and/or rape at least 11 women who were incarcerated at FCI Tallahassee in the custody of the United States Bureau of Prisons (hereinafter "BOP") while he was employed there. Instead of protecting the women who were

under his care and control, Officer Hatten was allowed and emboldened to prey upon them.

2.      Plaintiff Bonnie Hernandez (hereinafter "Plaintiff" or "Ms. Hernandez") is one of the victims who were brutally sexually abused by Officer Hatten. Ms. Hernandez was incarcerated at FCI Tallahassee from around July 2015 through August 2022. Over time, Officer Hatten groomed, manipulated, and coerced Ms. Hernandez into sexual submission, using the power and resources he had at his disposal as a correctional officer. In or around October 2021, Officer Hatten escalated his sexual abuse to forcible rapes, on repeat occasions, taking Ms. Hernandez by force in isolated locations of FCI Tallahassee.

3.      Ms. Hernandez initially suffered her sexual abuse in silence, lest she was retaliated against or deprived of the modest privileges she had as an incarcerated individual. Officer Hatten exercised complete dominion and power over her as a correctional officer, with the key to her cell and control over her prison job, safety, health, welfare, and contact with the outside world. Other BOP officers who knew or should have known about Officer Hatten's sexual abuse permitted, condoned, or acquiesced to his misconduct.

4.      Despite her fears of being discredited or retaliated against, on or around August 10, 2022, Ms. Hernandez decided to report the sexual abuse to BOP personnel at FCI Tallahassee as she could not tolerate the aggression. Officer

Hatten's abuse only came to an end through Ms. Hernandez's courage to report him to prison officials, which started a criminal investigation into his conduct.

5.     On April 4, 2023, Officer Hatten was indicted for his sexual abuse of Ms. Hernandez, which was in violation of 18 U.S.C. § 2243(b). He quickly pled guilty on May 25, 2023, admitting in a statement of facts accompanying his plea agreement that he had engaged in a sexual relationship between October 2021 and August 2022 with Ms. Hernandez. He was sentenced to three months of incarceration and five years of supervised release on August 24, 2023. *See United States v. Hatten,* No. 4:23-cr-18 (RH) (MAF) (N.D. Fl.). If the case had proceeded to trial, the Government would have proven beyond a reasonable doubt that Officer Hatten had used FCI Tallahassee as his playground, systematically grooming, manipulating, preying upon, and raping Ms. Hernandez.

6.     To borrow from FBI Deputy Director Paul Abbate's words, Officer Hatten "repeatedly sexually abused an inmate in his care and thanks to the victim's bravery in coming forward, future abuse has been prevented."

7.     Officer Hatten's recurrent sexual abuse of incarcerated persons was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee during relevant times. Throughout

Officer Hatten's employment at FCI Tallahassee until his resignation in or around August 2022, BOP personnel deliberately ignored alarming warning signs and sex abuse allegations against Officer Hatten.

8. It was apparent to Ms. Hernandez and other victims incarcerated at FCI Tallahassee that BOP personnel would not intervene to prevent Officer Hatten's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, by 2020, BOP employees were aware that Officer Hatten was spending time alone with female prisoners and engaging in inappropriate sexual and/or flirtatious interactions with them. This highly abnormal behavior continued unchecked throughout Officer Hatten's tenure at FCI Tallahassee, with the acquiescence of other BOP officers who were acting within the course and scope of their employment.

9. One of the primary reasons Officer Hatten was able to continue abusing so many women for so long, including Ms. Hernandez, is because his fellow officers did not follow the operating protocols by sharing supervisory duties with him. Upon information and belief, two officers are required to be present during shifts to jointly supervise prisoners who work in recreation (commonly known as "rec"). Therefore, Officer Hatten should never have been alone with prisoners. However, during COVID, the upstairs recreational room was closed to prisoners, and other rec officers

would go upstairs to watch TV and use the computer instead of supervising prisoners outside with Officer Hatten. Officer Hatten took advantage of his fellow officers' dereliction of duties to accost, isolate, imprison, harass, abuse, assault, and rape women right under the eyes of the BOP.

10.    Officer Hatten took female prisoners to blind spots within FCI Tallahassee that were not captured by security cameras, contrary to the existing protocols. BOP personnel who were tasked with monitoring security cameras knew that Officer Hatten often interacted with incarcerated persons in these blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this.

11.    Officer Hatten would also bring contraband into FCI Tallahassee and use them as part of his *modus operandi* in sexual abuse. There was no intervention to correct this.

12.    Suspicions and allegations of Officer Hatten's sexual abuse abounded at FCI Tallahassee by the end of 2020, as many BOP employees saw, knew of, and disregarded Officer Hatten's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Tallahassee's security or operating protocols. Nevertheless, until August 2022, Officer Hatten continued to work as a sports specialist and/or correctional officer at FCI Tallahassee with the willful

ignorance and tacit approval of his colleagues and/or supervisors, leaving countless victims in his wake, including Ms. Hernandez.

13.    It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as abject systemic failures at FCI Tallahassee and BOP, that Officer Hatten's sexual abuse of prisoners could continue unabated until August 2022.

14.    As a result, Plaintiff Ms. Hernandez was forced to engage in recurrent sexual encounters with Officer Hatten by threats of force or coercion. Starting with grooming and sexual comments in or around 2019, Officer Hatten's abuse developed into full-fledged rapes in or around October 2021, with intercourse without protection occurring on a weekly basis until August 2022. Officer Hatten became increasingly aggressive and threatening over time, to the extent that during the last rape in August 2022, Ms. Hernandez experienced vaginal bleeding. As a prisoner under Officer Hatten's custodial, supervisory, and disciplinary authority, Ms. Hernandez did not have a meaningful escape from his predatory conduct. She felt that she had no choice but to comply with Officer Hatten's abuse. Even after Ms. Hernandez took it upon herself to report Officer Hatten, the Government failed to explore the severity of her abuse fully or accurately during Officer Hatten's criminal proceeding, resulting in a mere 3-month sentence that does not begin to capture the egregious circumstances herein.

15.     Ms. Hernandez experienced catastrophic and unnecessary pain and suffering because of Defendant's egregious disregard for, and carelessness towards, Plaintiff's safety and well-being despite the myriad warning signs regarding Officer Hatten's abhorrent conduct.

16.     Plaintiff brings this suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to her by various BOP personnel including Officer Hatten, within the scope of their employment with the BOP.

17.     Plaintiff seeks redress for Defendant's unlawful conduct, which caused her to suffer permanent and catastrophic injuries.

## **JURISDICTION AND VENUE**

18.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiff's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.

19.     This Court has personal jurisdiction because the alleged incidents occurred within the confines of the State of Florida.

20.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Plaintiff's

claims occurred within the boundaries of this District and Division, in the County of Leon.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

21.     Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America. The Claim was timely filed with the BOP on November 7, 2022, within two (2) years of the accrual of the causes of action.

22.     BOP received the Administrative Claim but has failed to dispose of this Claim to date. Under 28 U.S.C. § 2675(a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." By the filing of this action on July 24, 2023, Plaintiff elected to deem BOP's lack of response within six months of filing as the final denial of Plaintiff's Administrative Claim in its entirety. Therefore, Plaintiff exhausted requisite administrative remedies under 28 U.S.C. §§ 2401(b) and 2675(a).

## PROCEDURAL HISTORY

23.     On July 24, 2023, a civil complaint was filed on behalf of Plaintiff Ms. Hernandez by Busch Mills & Slomka, LLP, against Defendant United States of America. *See* Dkt. 1.

24.     On January 11, 2024, this Honorable Court granted a motion to substitute attorney by Ms. Hernandez, allowing the undersigned attorneys to substitute as counsel of record for the Plaintiff. *See* Dkt. 22, 27.

25.     On January 12, 2024, this Court granted Plaintiff's unopposed motion for extension of time, which allowed Plaintiff to file an amended complaint by February 16, 2024, and Defendant to respond by March 8, 2024. *See* Dkt. 25. This amended complaint is therefore timely filed, with the amendment permitted as a matter of course under FRCP 15(a)(1)(B).

## PARTIES

### Plaintiff

26.     At all times relevant hereto, Plaintiff Ms. Hernandez was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Hernandez was transferred out of FCI Tallahassee in or around August 2022 and is currently housed in a different BOP facility in the State of Florida.

### Defendant

27.     Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiff's claims under the Federal Tort Claims Act. The United States is a sovereign entity that has waived its immunity for certain claims,

including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

28.   At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all federal correctional matters including at FCI Tallahassee and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Hatten.

29.   In addition, at all relevant times, Defendant United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

30.   At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Hatten, as well as his colleagues and supervisors, to serve as "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h).

31.   At all times relevant hereto, Officer Hatten was a sports specialist, recreational officer, correctional officer, and/or an employee of BOP and Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Hatten was responsible for the day-to-day oversight, supervision, safekeeping, care,

custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

32.   At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also employees of BOP and Defendant United States. In their capacity as agents, servants, and employees of Defendant United States, and within the course and scope of their employment as such, these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

33.   At all times relevant hereto, Officer Hatten was an agent, representative, or employee of Defendant United States. At all times relevant hereto, Officer Hatten acted within the course and scope of said agency, representation, or employment and was within the scope of his authority, whether actual or apparent. At all times relevant hereto, Officer Hatten was the authorized agent, partner, servant, or contractor of Defendant United States, and the acts and omissions herein alleged were done by Officer Hatten acting through such capacity, within the scope of his authority, with the permission, ratification, approval, and consent of Defendant United States.

34.   At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also

agents, representatives, or employees of Defendant United States. At all times relevant hereto, these officers acted within the course and scope of said agency, representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of Defendant United States.

## JURY DEMAND

35.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues and claims in this action that are so triable.

## FACTUAL BACKGROUND

### INDICATIONS AND WARNING SIGNS OF HATTEN'S SEXUAL ABUSE

36.    Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

37.    Congress enacted the Prison Rape Elimination Act (hereinafter "PREA") in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, the U.S. Department of Justice promulgated certain regulations, which remain binding on all BOP facilities, including FCI Tallahassee. *See* 28 C.F.R. § 115. Under PREA

regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

38.    In addition, BOP's policies titled "program statements" set forth rules and procedures that all BOP employees were required to follow during relevant time periods:

    a. Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

    b. Program Statement 3420.11 states that BOP employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with prisoners, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

c. Program Statement 3420.11 goes on to state that "[a]ll allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

d. Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements a zero-tolerance policy toward all forms of staff-on-prisoner sexual abuse, including sexual harassment.

e. Program Statement 5324.12 mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

39. BOP policy requires training of all employees who may have contact with prisoners on how to fulfill their responsibilities under these rules and procedures.

40. Upon information and belief, Officer Hatten's employment at FCI Tallahassee began in or around 2018.

41. Prior to being placed in FCI Tallahassee, Officer Hatten worked at Marianna Camp, another female BOP facility that is located about an hour away from FCI Tallahassee. Upon information and belief, BOP personnel at Marianna Camp were made aware of Officer Hatten giving commissary items or paying for

14

phone minutes for certain women prisoners, which was a warning sign of inappropriate relations.

42.    Throughout the time that Officer Hatten worked as a sports specialist and/or correctional officer at FCI Tallahassee, from around 2018 through 2022, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel. He utilized similar methods to stalk, assault, abuse, and terrorize at least 11 different victims incarcerated at FCI Tallahassee. His routines and *modus operandi* involved flagrant violations of FCI Tallahassee's security and operating protocols, which were and should have been obvious to other BOP personnel.

43.    From 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten placing himself in posts where he would be alone and unsupervised with prisoners on their job details. For instance, he volunteered to supervise women working at rec when other officers were not around, and he also worked overtime in food services to supervise women working in the kitchen.

44.    From 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and

executive staff, observed Officer Hatten spending substantial amounts of time alone with incarcerated women. They also observed him escorting certain women to various isolated areas within FCI Tallahassee, which were typically "blind spots" that were not captured by security cameras. There was no legitimate explanation as to why Officer Hatten frequently accompanied incarcerated women to these blind spots by himself.

45.   Officer Hatten, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as a shed with recreational tools, commonly known as "rec shack," and the second floor of a recreational building, commonly known as "upstairs rec." He repeatedly took advantage of these known blind spots to brutally abuse his victims, including Ms. Hernandez, by raping them, digitally penetrating their vaginas, forcing them to perform oral sex, and fondling their body. Other BOP officers knew of, and disregarded, Officer Hatten's abnormal behavior of repeatedly isolating himself with certain prisoners.

46.   Upon information and belief, there were cameras outside of the rec shack and the recreational building but no cameras inside to capture what was happening. Officer Hatten knew this and would lock himself inside with Plaintiff Ms. Hernandez and other women.

47.    Officer Hatten also abused his authority and flaunted his power by providing his victims with certain benefits or promises of benefits. For example, Officer Hatten frequently told Ms. Hernandez that he was "protecting" her job, implying that it would be taken away if she tried to report him. Officer Hatten also frequently brought contraband and gifts to his victims, including Ms. Hernandez, which should have been obvious to other BOP personnel. Had BOP personnel conducted the needed investigations into the benefits that certain prisoners had received from Officer Hatten, they would have discovered and stopped his sexual abuse before the first time he raped Plaintiff in 2021.

48.    At FCI Tallahassee, Officer Hatten quickly developed a widespread reputation among women prisoners for being a "pervert" who said and did inappropriate things to them. This reputation was well known to other BOP personnel, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff.

49.    Throughout 2020, with the COVID-19 pandemic, Officer Hatten's sexual abuse escalated. For social distancing purposes, correctional officers including Officer Hatten were given more power to isolate prisoners and control the prisoners' movements throughout the facility. Officer Hatten used this power to isolate, terrorize, and abuse his victims at his will. In addition, with COVID-19, other

officers, particularly those working in recreation, were even less likely to oversee or intervene in Officer Hatten's suspicious conduct than before.

50.    Upon information and belief, Officer Cornelius Jones ("Officer Jones"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Jones allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Jones knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Jones turned a blind eye and allowed Officer Hatten unfettered access to his victims. Officer Jones himself was verbally abusive to prisoners, calling them ugly, fat, "bitch," or sexually degrading terms, supporting his dismissive attitude towards Officer Hatten's sexually abusive conduct.

51.    Upon information and belief, Officer Eric Love ("Officer Love"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Love allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Love knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Upon information and

belief, Officer Love had witnessed a prior incident wherein another officer at FCI Tallahassee, Jimmy Highsmith, had sexually abused a woman and was eventually convicted of that crime. Therefore, Officer Love knew or should have known the indications, signs, and concerns of Officer Hatten's sexually abusive conduct. Nonetheless, Officer Love turned a blind eye and allowed Officer Hatten unfettered access to his victims.

52.　Upon information and belief, Officer Larry Mitchell ("Officer Mitchell"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as he should have, Officer Mitchell allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners, including Ms. Hernandez, to see Officer Hatten by themselves. Officer Mitchell knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Mitchell turned a blind eye and allowed Officer Hatten unfettered access to his victims.

53.　Upon information and belief, Officer Nicole Lakoe Jackson ("Officer Jackson"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten as she should have, Officer Jackson allowed Officer

Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners, including Ms. Hernandez, to see Officer Hatten by themselves. Officer Jackson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. In fact, around October 2021, Officer Jackson made a comment to Ms. Hernandez and another prisoner that, "y'all need to go sit outside with y'all daddy," referring to Officer Hatten. Despite her apparent awareness of inappropriate relationships between Officer Hatten and certain women, Officer Jackson turned a blind eye and allowed Officer Hatten unfettered access to his victims.

54.     Upon information and belief, Officer Lee Adamson ("Officer Adamson"), was the recreation supervisor with authority over Officer Hatten as well as Officers Jones, Love, Mitchell, and Jackson. Instead of monitoring, supervising, and disciplining Officer Hatten as he should have, Officer Adamson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Adamson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them gifts. Nonetheless, Officer Adamson turned a blind eye and allowed Officer Hatten unfettered access to his victims. Upon information and belief, Officer Adamson favored Officer Hatten over other recreational officers and condoned his inappropriate behavior, emboldening Officer Hatten to use the prison facility as his personal brothel. For

example, Officer Adamson would give Officer Hatten the first chance at overtime assignments before other recreation officers.

55.    Given the overtness and frequency with which Officer Hatten preyed upon women who were under his custody, other BOP personnel suspected or should have suspected that Officer Hatten was sexually abusing prisoners. Binding PREA regulations mandate staff reporting, whereby all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

56.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and

Adamson had numerous opportunities to follow the above-mentioned mandates and stop Officer Hatten's misconduct. Officer Hatten's actions were abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers saw or should have seen that Officer Hatten frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop Officer Hatten's suspicious and recurrent behavior.

57.    Defendant United States and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Officer Hatten despite numerous indications of sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

58.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson condoned, permitted, acquiesced to, consented to, and tacitly approved Officer Hatten's longstanding abuse of prisoners. Officer Hatten's ongoing abuse of multiple prisoners at FCI Tallahassee was so widely known throughout the prison that the staff turned it into a running joke. Instead of following protocols to protect

22

the prisoners in their care, the prison staff sat around making jokes at their expense. Their actions – and inactions – allowed Officer Hatten to rape and abuse multiple women with impunity.

59.    Before Officer Hatten began to rape Ms. Hernandez in or around October 2021, agents, servants, contractors, and employees of BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee, were aware of suspicions, indications, or concerns regarding Officer Hatten's sexual misconduct. They were aware of Officer Hatten's frequent protocol violations and unexplained suspicious interactions with certain prisoners. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Officer Hatten.

60.    It is extraordinary and inexplicable that Defendant United States continued to allow Officer Hatten to spend time alone with female prisoners in isolation, creating daily opportunities for him to commit additional sexual assaults.

61.    The fact that Officer Hatten could get away with sexual abuse while flagrantly violating BOP's policies led his victims, including the Plaintiff, to believe that he was untouchable. The victims had legitimate concerns that they would suffer retaliation or other substantial harm if they were to report Officer Hatten's assaults. To further fuel this fear, Officer Hatten verbally threatened his victims, including the

Plaintiff, to ensure their silence. He reminded his victims that he had the power to take away their privileges, transfer them to a different facility away from their families, put them in the special housing unit ("SHU"), or take away their job.

62.     BOP personnel at FCI Tallahassee, including lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators, knew Officer Hatten's reputation as a sexual predator. They also knew that female prisoners are reluctant to come forward with information regarding staff sexual abuse for fear of reprisal and loss of work privileges. Despite these known issues, FCI Tallahassee granted Officer Hatten unrestricted and unsupervised contact with numerous women, emboldening him to abuse his position of authority to threaten, violate, and assault his victims.

## HISTORY OF SEXUAL ABUSE AT FCI TALLAHASSEE – "DEN OF DESPAIR"

63.     FCI Tallahassee has a long and sordid history of sexual abuse within its facility by correctional officers against the prisoners whom they were duty-bound to protect.

64.     The facility first gained notoriety in 2006 when there was a shoot-out between a correctional officer and Federal Bureau of Investigation ("FBI") agents

that led to the death of two people. In that case, the FBI was present to investigate and arrest six guards for sexually abusing the female prisoners in their custody.[1]

65.     FCI Tallahassee has one of the highest rates of staff-on-prisoner abuse complaints in the country, receiving more than 130 complaints since 2012.[2] It is highly likely that the problem is even more widespread than this figure suggests, but it goes largely unchecked, because of cultural tolerance, cover-ups, and organizational reprisals against prisoners who dare to report staff abuse.

66.     Physician assistant Paul Rolston is alleged to have sexually abused numerous women under his care in FCI Tallahassee beginning in around 2018. Despite several civil complaints filed against PA Rolston, instead of firing this serial abuser, FCI Tallahassee simply shifted him into the male facility, continuing the cycle of silence and abuse at FCI Tallahassee and further perpetuating the environment that protected the abusers at the cost of vulnerable women.[3]

67.     In August 2021, Officer Phillip Golightly was sentenced to 24-months' imprisonment for sexually abusing female prisoners in his care.[4] Even though

---

[1] *2 federal employees die in Fla. prison shooting*, NBC News, June 21, 2006 at 9:23 AM, https://www.nbcnews.com/id/wbna13415618

[2] Silja J.A. Talvi, *WOMEN REPORT 'RAMPANT' SEXUAL ABUSE AT FEDERAL PRISON WHERE GHISLAINE MAXWELL IS HELD*, The Appeal, Apr 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/

[3] *Id.*

[4] *Former Bureau of Prisons Correctional Officer Sentenced to 24 Months In Federal Prison For Sexually Abusing Prisoners*, Press Release U.S. Attorney's Office, Northern District of Florida, Aug. 27, 2021, https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

Officer Golightly was indicted for, and pled guilty to, sexual abuse of only one victim, additional victims who suffered sexual abuse by Officer Golightly were acknowledged as part of the court records.[5] Upon information and belief, Officer Hatten and Officer Golightly, a convicted sexual abuser, were friendly with each other and knew about each other's sexually abusive conduct. In the same way that Officer Hatten summonsed his victims to the isolated rec shack, Officer Golightly called his victims to food services to sexually assault them, even though they did not even work in food services.

68.    In December 2021, another former recreational specialist at FCI Tallahassee, Officer Jimmy Lee Highsmith, was found guilty by a jury of sexually abusing a prisoner.[6] Upon information and belief, numerous complaints were filed against Officer Highsmith by women at FCI Tallahassee beginning around 2014, and yet BOP personnel at FCI Tallahassee ignored these complaints to keep him employed as a supervisor for women working at recreation—same as in Officer Hatten's case.

69.    There are many similarities in *modus operandi* of Officers Golightly, Highsmith, and Officer Hatten's sexual abuse, including taking women to off-camera areas by themselves and using their jobs as a basis for sexual coercion.

---

[5] *Id.*

[6] *Jury Convicts Former Tallahassee Federal Correctional Officer Of Sexual Abuse of Prisoner*, Press Release U.S. Attorney's Office, Northern District of Florida, Dec. 17, 2021, https://www.justice.gov/usao-ndfl/pr/jury-convicts-former-tallahassee-federal-correctional-officer-sexual-abuse-inmate.

Therefore, BOP personnel at FCI Tallahassee, including but not limited to recreational officers, supervisors, executive staff, and investigators, knew or should have known that Officer Hatten's conduct was highly indicative of sexual abuse. Nonetheless, BOP personnel violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

70.    BOP personnel's reckless disregard of the safety and welfare of victims including Plaintiff Ms. Hernandez is highlighted by the fact that multiple correctional officers were sexually assaulting women incarcerated at FCI Tallahassee throughout the relevant times. Officer Hatten fed into, and was also encouraged and enabled by, this toxic culture at FCI Tallahassee.

71.    Despite BOP's purported zero-tolerance policy, sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Tallahassee as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities). The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated

people by BOP personnel. The PSI Report specifically found that the United States, through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[7]

72.     Despite this established history of sexual abuse in BOP custody and at FCI Tallahassee specifically, Defendant United States failed to institute a reliable practice for detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Tallahassee's PREA audit reports that were published on or around July 6, 2021, and July 4, 2023, claimed that FCI Tallahassee was compliant with all PREA standards. Even though this audit report was published after PA Rolston and Officers Golightly, Highsmith, and Hatten's sexual abuse became public through criminal investigation, this obvious non-compliance with PREA standards cannot be found anywhere in the reports. This blatant deficiency reflects the culture of Defendant United States of turning a blind eye to BOP sexual abuse of incarcerated people.

73.     Based on the history of sexual abuse at FCI Tallahassee, Defendant United States had actual notice and knowledge that correctional officers could abuse their position of power to sexually assault prisoners, including in off-camera areas.

---

[7] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 4.

74.     Nevertheless, Defendant United States failed to take adequate steps to prevent Officer Hatten from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

75.     Upon information and belief, from around August 2019 through July 2022, Officer Hatten sexually abused numerous women in his custody at FCI Tallahassee. Other than Ms. Hernandez, ten (10) additional women have reported Officer Hatten's abuse to the BOP and/or FBI and other external investigative agencies.

76.     Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Tallahassee before, during, and after Officer Hatten's rapes of the Plaintiff.

**OFFICER HATTEN's SEXUAL ABUSE OF PLAINTIFF**

77.     Emboldened by other BOP personnel's failure to stop him, with increasing fearlessness, Officer Hatten used the tools available to him through the BOP, such as access to prisoners, control over their jobs and livelihood, and blind spots from cameras, to violate and terrorize his victims, including Plaintiff Ms. Hernandez.

78.    Ms. Hernandez first arrived at FCI Tallahassee in or around July 2015 at 39 years of age and remained incarcerated there until around August 2022.

79.    During this time, Plaintiff was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as the Plaintiff from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

80.    At FCI Tallahassee, Ms. Hernandez initially worked as a head tutor in the education center, but in or around January 2017, she was transferred to the recreation department as a wellness clerk. Her job duties included writing and creating sentry records for wellness classes. She enjoyed her job and found it to be a respite from the 10-year prison sentence ahead of her.

81.    Ms. Hernandez first encountered Officer Hatten when he began working at FCI Tallahassee full-time in or around 2019. At that time, Ms. Hernandez was working for other recreation supervisors, and Officer Hatten worked in the

upstairs recreation detail. Officer Hatten began to seek out Ms. Hernandez, increasingly crossing the professional and ethical boundaries between correctional officer and prisoner.

82.   Officer Hatten began grooming Ms. Hernandez by making inappropriate sexual comments to her and bringing her gifts, like outside food that was unavailable in the prison.

83.   Other BOP personnel, with due diligence, should have noticed that Ms. Hernandez had routine access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP Program Statement and should have been immediately reported and investigated so that it would not progress further. Instead, Officer Hatten was allowed unfettered access to Ms. Hernandez.

84.   Prior to COVID-19 pandemic, Officer Hatten routinely retrieved Ms. Hernandez to perform private work detail, including cleaning the upstairs recreation area, so that they would spend alone time. During these private work sessions, Officer Hatten continued to groom Ms. Hernandez, gaining her trust and testing the waters to see when he would be able to take advantage of her sexually.

85.   During the pandemic, Officer Hatten gained more control over escorting certain women to their work and isolating them in certain locations at rec. With fewer people around, he was able to isolate his victims into the upstairs rec or

rec shack with little concern that other officers would walk in. Around mid-2020, he began to lock certain women, including Ms. Hernandez, into the rec shack, so they would not be able to escape him. He also began to make more explicit sexual comments to Ms. Hernandez, including about his penis. No one intervened.

86.    Around this same time, Officer Hatten began groping, touching, and kissing Ms. Hernandez when they were alone. There were numerous occasions when he would grab her waist, pull her close to him, and graze his penis against her body.

87.    Officer Hatten made sure that he was the only correctional officer supervising prisoners working recreation details, so that he would spend time alone with his victims. For example, he would take women to the rec shack while other officers were in upstairs rec, and vice versa. This was in violation of the operating protocols by which at least two officers should have supervised women working recreation details. However, none of Officer Hatten's colleagues, including Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson, intervened to stop Officer Hatten's inappropriate conduct.

88.    In or around summer 2021, Officer Mitchell temporarily left FCI Tallahassee to work at another facility. This allowed Officer Hatten the opportunity to take over Officer Mitchell's 6:00am weekend shift. Even though Ms. Hernandez, on paper, was under the supervision of Officer Jackson, Officer Hatten took every opportunity to call Ms. Hernandez out to recreation at 6:00am to see him. This was

well outside the normal routine and should have been noticed by other officers, including Officers Adamson, Jones, Love, and Jackson, as well as Ms. Hernandez's unit team.

89.     Officers Adamson, Jones, Love, and Jackson violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

90.     Officer Hatten's actions towards Ms. Hernandez escalated to coercive sexual intercourse for the first time in the rec shack, in or around October 2021. Ms. Hernandez felt shocked but thought that the only option she had as a prisoner was to comply and keep silent. The rapes continued over the course of a year in the rec shack, rec shack bathroom, and/or upstairs rec until August 2022, on at least a weekly basis. Officer Hatten never used protection and always ejaculated inside of Ms. Hernandez's vagina, without her consent.

91.     Other prisoners were required to follow the rules to be either escorted by an officer from their unit to recreation or to go with other prisoners in their unit,

but at Officer Hatten's behest, Ms. Hernandez often walked from her unit to the rec shack by herself with no supervision. Once there, Officer Hatten would lock the door and engage in sexual acts with Ms. Hernandez. Officer Hatten would not allow other prisoners into the rec shack until around 7:30am, which was also notable and suspicious.

92.     In addition to using his position of authority to induce Ms. Hernandez to meet him in the rec shack at 6:00am, during the day, Officer Hatten frequently requested Officer Jackson to send Ms. Hernandez to him in his office or upstairs rec despite her not being assigned to his work detail. On other occasions, when Officer Jackson was off-duty, Officer Hatten would go to Ms. Hernandez's housing unit to tell her to come to rec, where he would again sequester her alone, while other prisoners cleaned other locations of recreation detail.

93.     Upon information and belief, Officer Jackson frequently asked Ms. Hernandez why Officer Hatten would constantly ask for Ms. Hernandez instead of working with his own crew. Officer Jackson also made a comment referring to Officer Hatten as "y'all daddy" to Ms. Hernandez and another prisoner, indicating her awareness of his inappropriate attentions. Despite this, Officer Jackson never reported her questions, concerns, or suspicions about Officer Hatten's actions, or took any other steps required by BOP protocols to ensure the protection and welfare

of Ms. Hernandez. In addition, Officer Jackson continued to knowingly send Ms. Hernandez to be alone with Officer Hatten.

94.    Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Hernandez in off-camera areas without interruption. There were no security cameras that captured the inside of the rec shack, upstairs rec, or Officer Hatten's office.

95.    Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending so much time alone and off-camera with Ms. Hernandez. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Hernandez. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

96.    Over time, Officer Hatten provided Ms. Hernandez with additional contraband gifts such as jewelry, makeup, nail polish, pens, hair conditioner, body wash, and tattoo ink from outside the facility. These gifts, clearly given to Ms.

Hernandez by a staff member, resulted in Ms. Hernandez getting disciplined and sent to the SHU.

97.     It is extraordinary and egregious that, while penalizing Ms. Hernandez for obtaining gifts from staff, BOP personnel at FCI Tallahassee utterly failed to investigate where the gifts came from—when it was apparent that they were from Officer Hatten. Had BOP personnel conducted the needed investigation into their own staff as required, they would have discovered Officer Hatten's conduct much earlier—and prevented him from raping Ms. Hernandez over and over and over again.

98.     In or around October 2021, Ms. Hernandez was sent to the SHU for an investigation regarding suspected preferential treatment by recreation staff. Not only did this unfairly penalize Ms. Hernandez instead of protecting her, but the SHU placement also gave Officer Hatten a further opportunity to accost, abuse, and assault Ms. Hernandez. The morning Ms. Hernandez was sent to the SHU, Officer Hatten raped her.

99.     Officer Hatten also took on additional shifts or overtime at the SHU and left his assigned posts to go to the SHU, so he could continue harassing Ms. Hernandez while she was in confinement. Other BOP personnel knew or should have known that Officer Hatten's sudden interest in the SHU was highly suspicious, but they did not intervene.

100.   Throughout the time that she was isolated in the SHU, Ms. Hernandez did not feel that she could safely report Officer Hatten's actions. She did not feel that she would be believed if she were to report Officer Hatten. She felt that Officer Hatten would continue to have unfettered access to her in the SHU, and she did not even know when she would be released from the SHU. Prisoners lose access to the bare modicum of privileges they have, including access to phone, mail, and recreation time, while they are in the SHU.

101.   Ms. Hernandez was in the SHU for about three months. When she was released on or around December 30, 2021, Officer Hatten told Ms. Hernandez that he trusted her not to disclose any information about him. Ms. Hernandez did not know what he would have done if she had disclosed his sexual abuse, but she continued to fear retaliation.

102.   As a further punishment for possession of the contraband given to her by Officer Hatten, Officer Adamson, the recreation supervisor, fired Ms. Hernandez from her recreation job and told her that the termination was permanent.

103.   However, a few weeks later, in or around January 2022, Officer Hatten told Ms. Hernandez in front of Officer Adamson to get a crew together so that she could be back on the recreation detail. Even though this was highly suspicious and inappropriate, Officer Adamson did not object and allowed Ms. Hernandez to now

work directly under Officer Hatten in recreation. By this behavior, Officer Adamson showed that he condoned Officer Hatten's inappropriate conduct.

104.   When Officer Hatten could not get assigned to recreation detail, he would pick up additional shifts in food services, so that he could interact with Ms. Hernandez in the kitchen. He would find every opportunity to have unmonitored access to prisoners, including Ms. Hernandez, and there were many opportunities for other BOP personnel, including but not limited to Officers Jones, Love, Jackson, and Adamson, to report and stop Officer Hatten's suspected sexual abuse.

105.   Officer Hatten's abuse of prisoners, especially of Ms. Hernandez, was not a well-kept secret. Upon information and belief, Officer Hatten publicly acknowledged his sexual liaison with Ms. Hernandez on or around May 8, 2022, in front of prisoners and staff. At a Mother's Day celebration at FCI Tallahassee on that day, Officer Hatten took the microphone to give a special, public thanks to Ms. Hernandez, stating: "I couldn't have done this without the help of Ms. Hernandez."

106.   Upon information and belief, Officer Hatten also provided Ms. Hernandez with gifts for Mother's Day, such as two pairs of new weight gloves.

107.   Officer Hatten continued to give Ms. Hernandez things that were not available at the facility, such as liquid eyeliner. No officer spoke to Ms. Hernandez about how she acquired contraband items that she openly used at FCI Tallahassee. Upon information and belief, providing contraband to prisoners is a common,

predatory tactic used in the context of sexual abuse and should have resulted in termination of Officer Hatten.

108.   Despite being aware of Officer Hatten's suspicious behavior, his colleagues and supervisors refused to take any action, allowing him to act with impunity. Officer Hatten began to make explicit threats to Ms. Hernandez that if she were to resist him, he would report her for contraband and place her in the SHU. He used his power and authority as a correctional officer to provide Ms. Hernandez with contraband, initially as a coercive tactic but later also for extortion.

109.   In or around June 2022, Officer Hatten ordered Ms. Hernandez to remove a tattoo of her children's father's name from her body. He gave her some ink to do so. Ms. Hernandez was caught by another officer while getting the tattoo removed. Although tattoo ink is completely banned at FCI Tallahassee, not a single staff member questioned Ms. Hernandez about who provided her with the ink. Instead, BOP penalized Ms. Hernandez alone and put her in the SHU again.

110.   Upon information and belief, Officer Hatten again visited Ms. Hernandez in the SHU in the summer of 2022. Upon information and belief, other officers, such as Lieutenant FNU Paramour, observed Officer Hatten visiting Ms. Hernandez's SHU cell, even though he had no legitimate purpose for being there. Nonetheless, no BOP personnel questioned Officer Hatten or Ms. Hernandez about these visits.

111.   In or around July 2022, Officer Mitchell returned to FCI Tallahassee and became aware of questionable contact between Officer Hatten and Ms. Hernandez. Officer Mitchell re-claimed his 6:00am weekend shifts, and Officer Hatten would come in at 10:00am instead. Officer Mitchell frequently sent Ms. Hernandez alone to Officer Hatten's office in upstairs rec at his request, where Officer Hatten would assault and threaten her. Once, Officer Hatten kept Ms. Hernandez in his office for so long that Officer Mitchell remarked to Ms. Hernandez that he thought she had left the rec area and gone back to her housing unit. There were also other occasions when Officer Mitchell asked Ms. Hernandez why Officer Hatten always needed her to "hold his hand" to help him with his job. Nonetheless, there is no indication that Officer Mitchell spoke to either Officer Hatten or supervisors directly about these irregular and peculiar incidents.

112.   In or around July 2022, Officer Mitchell was told by another prisoner that Officer Hatten frequently locked Ms. Hernandez into the rec shack. Officer Mitchell's response was that Officer Hatten could not do that. Officer Mitchell further said that his own mother had been imprisoned and therefore he did not think it was okay for prisoners to be taken advantage of. While Officer Mitchell may have attempted to provide emotional support to victims of Officer Hatten with these words, his platitudes were wholly insufficient to protect them and constituted a total failure of his responsibility to report what he had learned.

40

113.   Officer Mitchell told Ms. Hernandez that they would have a follow-up conversation about Officer Hatten locking her into the rec shack. However, he never spoke to her about it again or followed up on it as he was mandated to do.

114.   Around this time, Ms. Hernandez also spoke to Officer Love and Officer Jackson about Officer Hatten locking her into the rec shack. They refused to report Officer Hatten as they were required to do, and instead told Ms. Hernandez that they could not do anything without proof. Given their dismissive attitude, Ms. Hernandez did not feel comfortable sharing the full extent of Officer Hatten's sexual abuse with them.

115.   Over time, Officer Hatten became more brazen in his sexual assaults. He started to take Ms. Hernandez to the recreational area even during the evening or other hours when there was no reason to be in the rec. He also began to assault Ms. Hernandez when other people were within the earshot or in the vicinity. Still, no officer reported his actions or took any steps to stop the abuse.

116.   The frequency and violence of sexual assaults continued to escalate. Officer Hatten became increasingly aggressive towards Ms. Hernandez and began physically assaulting her, at times choking her or throwing her against a wall. He would threaten her position at recreation, a job he was aware she valued highly. He constantly reminded her that he was "protecting" her job. Ms. Hernandez interpreted his comments to mean that she would lose her job, be placed in the SHU, and/or lose

her privileges if she were to put a stop to the sexual abuse. He also made threatening remarks when raping her, such as "I will fuck you up." Officer Hatten's physical and verbal threats to Ms. Hernandez made her fearful to report his ongoing sexual harassment and abuse.

117. In the beginning of August 2022, Officer Hatten and Ms. Hernandez had a verbal disagreement and Ms. Hernandez tried to leave the rec shack. Officer Hatten told her to "get her ass back here," chased her, and violently threw her against a wall. She was terrified that Officer Hatten's aggression was getting out of hand. Fearful for her physical safety, she decided to take action to defend herself and report him, despite her fear of reprisals.

118. Upon information and belief, Ms. Hernandez learned that Officer Hatten would be away on vacation on or around August 10, 2022. Ms. Hernandez felt that she could safely report him only when he was away, so she decided that would be the day she would report him.

119. Unfortunately, Officer Hatten raped Ms. Hernandez again the evening before August 10, 2022. At around 7:00pm, he locked her into the rec shack again and violently forced her to have sex with him, tearing her vagina and causing her to bleed. Ms. Hernandez felt that she could not resist at all, lest he was to injure her further. Despite her fear, Ms. Hernandez collected her blood and Officer Hatten's

semen on a pantyliner, fearing she would not be believed unless she kept the evidence.

120.   On August 10, 2022, Ms. Hernandez reported Officer Hatten's rape to prison officials. She was taken to a clinic for a rape kit and then placed in the SHU for investigation. The DNA test confirmed that the semen found belonged to Officer Hatten. Officer Hatten did not return from his vacation and eventually "resigned" from his employment.

121.   Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and Paramour, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to the Plaintiff's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep the Plaintiff safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

122.   Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and

operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as the Plaintiff, demonstrating a plain disregard of an excessive risk to Plaintiff's safety and welfare.

123.   The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

## AFTERMATH OF OFFICER HATTEN'S SEXUAL ABUSE

124.   Even after she reported Officer Hatten, Ms. Hernandez felt overwhelmed, ashamed, and uncertain regarding how to process her victimization. As is common for victims of sexual abuse, she blamed herself for having fallen prey to Officer Hatten's manipulation and tried to rationalize or minimize his abhorrent conduct. As a previous survivor of domestic violence, Ms. Hernandez was particularly vulnerable to Officer Hatten's coercion and manipulation that turned into overt aggression.

125.   On or around August 15, 2022, Ms. Hernandez was transferred to FDC Miami.

126. Ms. Hernandez felt that this transfer was punitive, as FDC Miami is much more restrictive than FCI Tallahassee.

127. At FDC Miami, Ms. Hernandez has lost access to the limited freedoms she had at FCI Tallahassee, such as video calls with family or outdoor recreational periods. It is also a co-ed facility, despite Ms. Hernandez's requests to be placed in a women's-only facility given her sexual trauma.

128. BOP has also failed to provide proper counseling or psychological treatment to Ms. Hernandez, despite PREA and BOP mandates to provide her with such services. *See* 28 C.F.R. § 115.83.

129. To this day, Ms. Hernandez is continuing to suffer the costs of her victimization at Officer Hatten's hands. She suffers from night terrors about the physical and sexual abuse she suffered from Officer Hatten, causing an inability to sleep. Ms. Hernandez has been prescribed sleep medication to assist with these symptoms, but they do not address the root cause of her trauma.

130. Ms. Hernandez must take psychiatric medications that she previously did not need because of Officer Hatten's sexual assaults. In or around October 2021 when Officer Hatten began to rape her, Ms. Hernandez started to take medication to treat depression. As she continues to experience flashbacks and dreams about Officer Hatten choking her in the rec shack, she is now on a different medication. However,

she is not being provided with counseling or therapeutic support, which exacerbates her declining mental health.

131.   Furthermore, Ms. Hernandez is fearful of suffering retaliation from BOP personnel who may learn that she had reported another correctional officer's sexual abuse. She finds herself questioning whether she made the right decision in reporting Officer Hatten when there is a clear lack of understanding by the BOP about the extremely traumatic nature of his sexual assaults.

132.   As a result of the foregoing, Plaintiff continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Plaintiff also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

133.   Upon information and belief, Plaintiff will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to

incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's rapes.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### NEGLIGENCE CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

134.   Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

135.   At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees undertook and endeavored to and did provide custodial care to people incarcerated at FCI Tallahassee, including but not limited to the Plaintiff.

136.   At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Tallahassee, including but not limited to wardens, associate wardens, executive staff, supervisors, captains, department heads, lieutenants, unit managers, counselors, correctional officers, and investigators.

137.   These FCI Tallahassee personnel were all federal employees and were acting within the scope of their employment with the Defendant United States when exercising custodial care, control, and supervision to Plaintiff Ms. Hernandez.

138.   At all relevant times, FCI Tallahassee personnel including Officer Hatten held themselves out to persons incarcerated at FCI Tallahassee, and in particular to Plaintiff, as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

139.   Defendant United States, individually or through its agents, servants, contractors, and/or employees owed a non-delegable duty of care to Plaintiff while she was housed at FCI Tallahassee.

140.   It was the Defendant's duty to ensure that correctional and/or administrative personnel with a history of assaults were not allowed to harm or injure other incarcerated people.

141.   It was the Defendant's duty to maintain, operate, and control FCI Tallahassee as a safe and secure space for persons in it, including but not limited to Plaintiff.

142.   It was the Defendant's duty to provide adequate custody, control, supervision, and monitoring to persons at FCI Tallahassee, including but not limited to Plaintiff.

143.   It was the Defendant's duty to adequately protect incarcerated people, including Plaintiff from foreseeable harm inflicted by BOP personnel known to be dangerous, including Officer Hatten.

144.   Defendant United States, individually or through its agents, servants, contractors, and/or employees, acting within the scope of their office or employment, breached each of the foregoing duties that they owed to Plaintiff by failing to take adequate steps to protect her from Officer Hatten promptly, despite the obvious risks presented by Officer Hatten, a known predator in uniform.

145.   That breach directly exposed Plaintiff to an unreasonable risk of bodily injury, causing her to fear for her life and safety, and resulted in her being raped on repeat occasions by Officer Hatten.

146.   Agents, servants, contractors, and/or employees of the United States knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

147.   Agents, servants, contractors, and/or employees of the United States knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

148.   Agents, servants, contractors, and/or employees of the United States knew or should have known that there was an excessive risk that prisoners, and

Plaintiff in particular, would be sexually assaulted by Officer Hatten. They observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that they knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet they did not do so.

149.   Agents, servants, contractors, and/or employees of the United States disregarded or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

150.   Despite actual and constructive notice of Officer Hatten's abuse, agents, servants, contractors, and/or employees of the United States failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

151.   Despite actual and constructive notice of Officer Hatten's abuse, agents, servants, contractors, and/or employees of the United States did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

152.   Agents, servants, contractors, and/or employees of the United States assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse.

They enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

153.   Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in training, retaining, supervising, and/or disciplining Officer Hatten.

154.   Despite actual and constructive notice of Officer Hatten's abuse, agents, servants, contractors, and/or employees of the United States failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate with impunity.

155.   Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

156.   Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain safe and secure environment and protect Plaintiff from foreseeable harm.

157.   Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

158.   Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

159.   Agents, servants, contractors, and/or employees of the United States mistreated Plaintiff and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiff is not yet aware.

160.   Plaintiff's injuries herein were proximately caused by the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

161.   Plaintiff's injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiff.

162.   The failure of FCI Tallahassee personnel to prevent, investigate, or acknowledge Officer Hatten's sexual abuse of prisoners, including Plaintiff, served no legitimate policy purpose. On the contrary, FCI Tallahassee staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

163.    Plaintiff' injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61, Program Statement 5324.12; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a), Program Statement 3420.11; and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

164.    FCI Tallahassee personnel's employment at FCI Tallahassee was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

165.    FCI Tallahassee personnel's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of Plaintiff.

166.    FCI Tallahassee personnel were aware of facts that gave rise to an unreasonable risk that Plaintiff would be irreparably injured.

167.   It was foreseeable to FCI Tallahassee personnel, based on the facts known to them, that Plaintiff was at a risk of imminent serious harm including sexual abuse.

168.   Yet, FCI Tallahassee personnel failed and/or refused to prevent the abuse of Plaintiff or to prevent its psychological consequences from worsening to the extent that they did.

169.   Agents, servants, contractors, and/or employees of the United States knew that they had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

170.   The above-described acts and omissions of FCI Tallahassee personnel constitute the tort of negligence under the laws of the State of Florida.

171.   Officer Hatten's continued rape and abuse of Ms. Hernandez meet the Florida requirements for physical impact.

172.   Under the Federal Tort Claims Act, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

173.   As a direct and proximate result of the foregoing, Plaintiff Ms. Hernandez   suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries,

permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

174.   As a direct and proximate result of the foregoing, Ms. Hernandez has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

175.   Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

176.   The above-described acts and omissions of FCI Tallahassee personnel, including Officer Hatten, constituted extreme and outrageous conduct.

177.   Defendant United States, individually or through its agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to Plaintiff.

178.   Plaintiff in fact suffered debilitating emotional suffering.

179.   The above-described acts and omissions of FCI Tallahassee personnel constitute the tort of negligent infliction of emotional distress under the laws of the State of Florida.

180.   Florida state law only recognizes this tort if it meets the requirements under the impact rule, which requires either physical touch or a physical manifestation of emotional distress. The "touch" requirement can be met with a foreign object, such as a gun or by a perpetrator's hands. Therefore, even without a physical manifestation of emotional harm, the Court can make a finding of negligent infliction of emotional distress. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846 (Fla. 2007).

181.   Here, Officer Hatten repeatedly raped Plaintiff, meeting the requirement of both physical touch and physical manifestation of emotional distress. Officer Hatten's sexual abuse of Plaintiff was severe and repetitive, and caused Plaintiff physical pain and extreme emotional trauma.

182.   Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

183.   As a direct and proximate result of the foregoing, Plaintiff Ms. Hernandez suffered debilitating psychological trauma, excruciating pain and

suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

184.   As a direct and proximate result of the foregoing, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Ms. Hernandez is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## THIRD CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
(Against Defendant United States)

185.   Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

186.   The acts and omissions of FCI Tallahassee personnel including Officer Hatten meet the standards of: (1) deliberate or reckless infliction of mental suffering; (2) through outrageous conduct; (3) that caused emotional distress; (4) which was

severe. *See Liberty Mut. Ins. Co. v Steadman*, 968 So 2d 592, 594 (Fla. Dist. Ct. App. 2007).

187.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, engaged in extreme and outrageous conduct by repeatedly subjecting Plaintiff to sexual acts while she was incarcerated in their custody. They abused their authority and power to violate her in a manner that is shocking, atrocious, despicable, and intolerable beyond all bounds of decency.

188.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, had an intention to cause, or recklessly disregarded the probability of causing, severe emotional distress and mental injury to Plaintiff. *See Williams v City of Minneola*, 575 So 2d 683, 690 (Fla. Dist Ct App 1991).

189.    Officer Hatten's rapes occurred under coercive circumstances, and by intentionally subjecting Plaintiff to these acts, Defendant United States' agents, servants, contractors, and/or employees acted maliciously, in a manner that is deeply offensive to human dignity and void of penological justification.

190.    Plaintiff in fact suffered debilitating emotional suffering. Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

191.   The above-described acts and omissions of FCI Tallahassee personnel constitute the tort of intentional infliction of emotional distress under the laws of the State of Florida.

192.   Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, sexual battery, and sexual assault) perpetrated by Officer Hatten. Under 28 U.S.C. §2680(h), Defendant United States is liable for intentional torts perpetrated by its agents, including correctional officers and other law enforcement officers, that occurred within the scope of their employment or under color of federal law as here.

193.   At all relevant times, Officer Hatten was acting under color of authority as a "law enforcement officer" within the meaning of 28 U.S.C. §2680(h). At all relevant times, Officer Hatten supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned the Plaintiff within the scope and course of his employment with Defendant United States.

194.   At all relevant times, Officer Hatten used his authority as a law enforcement officer to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault the Plaintiff and to prevent her from disclosing the sexual assaults for fear of retaliation, victim-blaming or shaming, additional assaults, loss of employment, and SHU placement, among others.

195. At all relevant times, Officer Hatten used his authority as a law enforcement officer to sexually assault the Plaintiff, knowing that she had no ability to consent or to withhold consent.

196. As a result of FCI Tallahassee personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiff. Therefore, Plaintiff bring this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers including Officer Hatten.

197. As a direct and proximate result of the foregoing, Plaintiff Ms. Hernandez  suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

198. As a direct and proximate result of the foregoing, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional,

mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF

**SEXUAL BATTERY CLAIM
UNDER FEDERAL TORT CLAIMS ACT
(Against Defendant United States)**

199.   Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

200.   Plaintiff brings this Claim under the FTCA for sexual battery against the United States, based on the conduct of its officers including Officer Hatten.

201.   Officer Hatten committed sexual battery on Ms. Hernandez without her consent.

202.   Officer Hatten repeatedly coerced Ms. Hernandez into sexual submission through the threat or force or violence. Ms. Hernandez reasonably believed that Officer Hatten had the present ability to execute the threat.

203.   Officer Hatten repeatedly coerced Ms. Hernandez into sexual submission by threatening to retaliate against her, and she reasonably believed that as a correctional officer, he had the ability to execute the threat in the future.

204.   In addition, Ms. Hernandez reasonably believed that Officer Hatten was in a position of control or authority, and that she did not have an ability to consent or withhold consent to sexual acts with him.

205.   Plaintiff was incapable of consenting. 18 U.S.C. § 2243(b) makes it a felony for a BOP employee to "knowingly engage in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging." Consent is not a defense to this crime, considering the inherently unequal power dynamic between BOP employees and prisoners. As the Office of Inspector General ("OIG") explained in a 2005 report regarding prison staff sexual abuse, prisoners are precluded from having the same ability as staff members to consent to a sexual relationship. Simply put, there is no scenario under which an incarcerated person can give consent to sexual contact, harassment, or abuse by BOP personnel.

206.   Without Ms. Hernandez's consent, Officer Hatten repeatedly penetrated her vagina with his penis, with the subjective intent to gratify his own sexual desire and/or to humiliate Ms. Hernandez. He thereby made intentional harmful and offensive sexual contact with Ms. Hernandez, with the intent to cause harmful or offensive contact. Officer Hatten's contact with Ms. Hernandez was deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

207.   As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

208.   As a direct and proximate result of the foregoing, Plaintiff has suffered severe distress including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Ms. Hernandez is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FIFTH CLAIM FOR RELIEF

### SEXUAL ASSAULT CLAIM
### UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

209.   Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

210.   Plaintiff brings this Claim under the FTCA for sexual assault against the United States, based on the conduct of its officers including Officer Hatten.

211. Officer Hatten intentionally threatened Ms. Hernandez to physically harm her, with an apparent ability to do so as a correctional officer. The threats occurred by word and act, with Officer Hatten verbally threatening Ms. Hernandez that he "will fuck you up" as well as choking her and physically throwing her against a wall.

212. Officer Hatten intentionally caused an imminent and reasonable apprehension of sexual assault, creating a well-founded fear in Ms. Hernandez that violence was imminent. He repeatedly acted with the intent to cause harmful and offensive contact with Ms. Hernandez, including sexually offensive contact as described above.

213. As a direct and proximate result of the foregoing, Plaintiff Ms. Hernandez suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

214. As a direct and proximate result of the foregoing, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional,

mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Bonnie Hernandez respectfully requests that judgment be entered against Defendant United States, and that this Court grant the following to the Plaintiff:

1.      An award of compensatory damages for all injuries caused by the Defendant, including psychological and personal injuries, pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and mental, financial, economic, and reputational damages, both past and future, general and special, and other harm, in an amount to be determined at trial;

2.      An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3.      An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

4.      An award of reasonable attorneys' fees to the fullest extent permitted by law; together with

5.      Such other and further relief at law or in equity as this Court may deem just and proper.

S/ *Jaehyun Oh*
**JAEHYUN OH**
The Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, 37th Floor,
New York, NY 10016
New York Bar No. 5668512
Tel: (212) 869-3500 Ext. 245
j.oh@fuchsberg.com
*Attorney for Plaintiff*

S/ *Whitney Marie Untiedt*
**WHITNEY MARIE UNTIEDT**
Untiedt Dabdoub & Tyler PLLC
1600 Ponce De Leon Blvd., 10th Floor,
Coral Gables, FL 33134
Florida Bar No. 15819
Tel: (305) 330-2397
whitney@utdlegal.com
*Attorney for Plaintiff*